# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| DWAINE COLEMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case 2:23-cv-2612-SHM-atc |
| ) | |
| KELLOGG'S CO., ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Before the Court by Order of Reference[1] is Defendant WK Kellogg Co.'s ("Kellogg") Motion for Summary Judgment, filed May 7, 2025. (ECF No. 84.) *Pro se* Plaintiff Dwaine Coleman responded on June 13, 2025 (ECF No. 92),[2] and Kellogg filed a Reply on June 10, 2025 (ECF No. 88). For the reasons set forth below, it is recommended that Kellogg's Motion be granted and Coleman's case be dismissed in its entirety.

## PROPOSED FINDINGS OF FACT

As a threshold matter, the Court must determine which facts are undisputed for purposes of ruling on the Motion. Local Rule 56.1(a) describes what is required of a party moving for summary judgment, mandating that the motion "be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial. Each fact shall be set forth in a separate, numbered paragraph [and] supported by specific

---

[1] On May 13, 2025, United States District Judge Samuel H. Mays, Jr. referred the Motion to the undersigned for Report and Recommendation. (ECF No. 86.)
[2] Coleman initially filed a Response on May 27, 2025 (ECF No. 87), but then requested leave to amend that Response (ECF No. 91), which has been granted (ECF No. 95). The "corrected" Response (ECF No. 92) is thus the filing that will be considered herein.

citations to the record." Local Rule 56.1(b) requires that the non-moving party respond to each of those numbered facts by either "(1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; (3) or demonstrating that the fact is disputed." The Rule requires:

> Such response shall be filed with any memorandum in response to the motion. The response must be made on the document provided by the movant or on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant. In either case, the non-movant must make a response to each fact set forth by the movant immediately below each fact set forth by the movant.

Local Rule 56.1(d) and Federal Rule of Civil Procedure 56(e) provide that, if a party fails to respond to the assertion of facts, the Court may consider the asserted facts undisputed for purposes of summary judgment.

Coleman's Response does not comply with these rules. Coleman did not respond to Kellogg's Statement of Undisputed Material Facts in separate numbered paragraphs. (ECF No. 92.) Instead, the Response attempts to refute Kellogg's legal arguments and dispute its Facts in a commingled, narrative format that makes it difficult to discern between the two.[3] Where the Court can discern an attempt by Coleman to dispute any of Kellogg's Facts, those attempts will be considered herein, to the extent relevant.[4] Where Coleman has not refuted any of Kellogg's

---

[3] In his Response, Coleman takes issue with Kellogg's failure to provide certain documents in discovery. That Response, however, is not the proper vehicle to raise discovery issues in this matter. Discovery disputes are resolved by consultation between the parties or, if those efforts are unsuccessful, by filing a motion to compel. Though Coleman filed a motion to compel the production of documents (ECF No. 63), he failed to consult with Kellogg prior to doing so and failed to comply with the Court's Order that he do so thereafter, and the motion was denied (ECF No. 82). Having failed to properly pursue that form of relief, Coleman cannot now resurrect those arguments to avoid summary judgment.

[4] Because Coleman appears to have sworn and attested to the entirety of his Response, the Court will consider the statements therein, including his "declaration of disputed facts," in determining whether Coleman has created a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c)(1)(A).

2

Facts, or his efforts to do so are undiscernible, those facts are deemed undisputed. *See Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("A district court is not required to search the entire record to establish that it is bereft of a genuine issue of material fact," as "judges are not like pigs, hunting for truffles that might be buried in the record." (citations, quotations, and alterations omitted)).[5]

In light of the foregoing, the following facts are undisputed for purposes of the Motion. Kellogg operates a manufacturing plant located in Memphis, Tennessee. (ECF No. 84-2 ¶ 1.) Many of the plant's workers are members of the Bakery, Confectionary, Tobacco Workers, and Grain Millers Union, Local 252G (the "Union"). (*Id.*) Coleman began working at Kellogg in November of 2021 as an hourly worker while the Union workers were on strike. (*Id.* ¶ 3.) Coleman never became a Union member and describes the Union as "hostile" towards him. (*Id.*) Coleman worked as a second-shift pellet maker on the production floor until April 2024 and then as a tank operator from April 2024 until his termination on June 7, 2024. (*Id.* ¶¶ 3, 4.)

When Coleman was hired, he complained about a lack of training, which he characterized as a safety complaint. (*Id.*) Coleman made additional complaints about safety concerns to the Union and Kellogg throughout his employment. (*Id.* ¶ 7.)[6]

During his time at the plant, Coleman accrued seniority for purposes of priority in some of the terms of his employment. (*Id.* ¶ 8.) His seniority rank was no higher than 299 out of 310

---

[5] Coleman's failure to follow the Local Rules in his Response is particularly notable given that the Court has already explained these requirements in recommending denial of his Motion for Summary Judgment. (ECF No. 76, at 6–7.)

[6] Coleman notes that "[d]ue to plaintiff's complaints OSHA made WK Kelloggs post a notice of alleged unsafe working conditions concerning the propane tanks shooting propane gas all over employees when changing out tanks, the posting of this notice is proof plaintiffs' [sic] activities were known as well as the numerous complaints to the integrity line under plaintiffs' [sic] name." (ECF No. 92, at 7.) Because Kellogg does not dispute that Coleman made safety-related complaints throughout his employment, this additional fact is not material.

3

employees. (*Id.*) Because the Memphis plant had so many long-tenured employees, Coleman's rank did not provide him preferred status where seniority was considered. (*Id.*)

Coleman's pellet-making position required frequent lifting of fifty pounds or more, the ability to push and pull seventy pounds, constant walking, forward reaching, frequent standing, overhead reaching, stair climbing, occasional bending, squatting, kneeling, and ladder climbing. (*Id.* ¶ 11.) Coleman injured his right shoulder while working in April 2022, but he did not see a doctor for his injury or receive any work restrictions until July 2022. (*Id.* ¶ 12.) Coleman's doctor told him he could not work in any capacity for various periods of time thereafter. (*Id.*) Kellogg honored that restriction and placed Coleman on medical leave. (*Id.*) Because Coleman's injury was covered by workers' compensation, he received two-thirds of his pay as indemnity wage payments when he could not work due to his injury, including any time off when Kellogg could not accommodate his restrictions. (*Id.* ¶ 13.)

Between July 26, 2022, and June 2, 2024, Coleman's doctor released him to work with medical restrictions limiting his ability to use his upper extremities. (*Id.* ¶ 14.) That restriction precluded Coleman from performing the functions of a pellet maker. (*Id.*) Coleman thus asked to be assigned to a "light-duty" job. (*Id.* ¶ 15.) The Memphis plant does not, however, have any jobs specifically designated as "light-duty." (*Id.* ¶ 16.)[7] Instead, employees with medical work restrictions are assigned tasks that arise from time to time that can be performed consistent with their limitations. (*Id.*) Those tasks are assigned based on an employee's restrictions, availability, and seniority. (*Id.*) Such light-duty tasks may include housekeeping or turning boxes of product

---

[7] Coleman asserts that "Kellogg has a binder labeled 'Light Duty Timecard.'" (ECF No. 92, at 9.) The materiality of this statement is unclear. As discussed herein, Kellogg apparently assigns tasks that are sometimes described as "light-duty" to certain employees. The existence of such a binder does not bring into dispute, however, the fact that Kellogg does not maintain wholly light-duty positions.

that collect at the end of a line referred to as the "hand loop," both of which take place on the production floor. (*Id.* ¶ 17.)[8] Another such task is assisting with paperwork in the front office. (*Id.*) Housekeeping requires the restricted employee to be able to push and pull brooms, shovel spilled product off the floor into a trough, and climb ladders. (*Id.* ¶ 18.) Hoses traverse the production floor, which are frequently wet or littered with cereal product. (*Id.* ¶ 20.)[9] As a matter of safety and prior to Coleman's employment, Kellogg determined that an employee restricted in the use of extremities would not be permitted to work on the production floor. (*Id.*) Kellogg informed Coleman that his restrictions limiting the use of his extremities precluded him from working safely on the production floor and, in any event, his restrictions would preclude him from performing the sweeping and shoveling tasks inherent in housekeeping. (*Id.* ¶ 21.)

At the time of Coleman's request for light-duty work, other employees were already working in all available light-duty positions, and each had higher seniority than Coleman. (*Id.* ¶ 22.)[10] Because those light-duty positions were already filled, and Kellogg had no business

---

[8] Coleman asserts that Kellogg "presented no documentation showing dates, times and or shifts that the hand loop had to be attended by employees." (ECF No. 92, at 8.) Coleman does not explain why such documentation is required or material.

[9] Coleman asserts that this fact is "patently false" and "can be proven upon inspection of facilities as all hoses are on reels rolled up and out of the way." (ECF No. 92, at 8.) Coleman does not, however, provide any evidence of such inspection under Federal Rule of Civil Procedure 34(a)(2).

[10] Coleman asserts that "defendants failed to produce a single piece of evidence proving all positions at the time were filled by more senior employees." (ECF No. 92, at 8; *see also id.* at 10 ("WK Kellogg's presented no evidence in their assertion that more senior employees were assigned all the light duty jobs.").) To the contrary, Kellogg cites to the Declaration of Claudia Langarica, who declared that, "[w]hile he was medically restricted from working his pellet maker job, I was not able to place Mr. Coleman in alternative[] task work that conformed to his medical restrictions, or that was not already being performed by another employee with higher seniority." (ECF No. 84-6 ¶ 9.) Coleman has failed to bring this fact into dispute.

5

need for additional light-duty work at that time, Kellogg placed Coleman on a medical leave of absence, and he collected two-thirds of his normal pay.  (*Id.* ¶ 24.)[11]

Labor Relations Advisor Brenda Bryson was generally aware that Coleman was on a medical leave of absence from mid-June 2022 until January 2024 but had no knowledge of his medical restrictions and did not participate in the evaluation of his ability to work in an alternative job.  (*Id.* ¶ 27.)

On June 20, 2023, Coleman returned to work, but his badge was not operational because Kellogg did not have a doctor's slip allowing him to return to work.  (*Id.* ¶ 28.)[12]  After verbal verification of his release, he was able to return to work but could not use the time clock to punch in or out for days worked in June.  (*Id.*)  When an employee misses a punch on the time clock, he fills out a missed punch form and has it approved by a scheduler.  (*Id.* ¶ 29.)  A scheduler approved the missed punch form for Coleman's work in June 2023 and turned it over to a payroll employee, who then authorized preparation of a manual check to cover his pay for those dates.  (*Id.*)  Coleman believes that Bryson delayed the payment in retaliation against him for filing an EEOC charge.  (*Id.*)  Bryson was unaware that Coleman filed an EEOC charge,

---

[11] Coleman asserts that "weekend work is not decided by seniority when evaluating light duty opportunities but by low in hours, also end of month clean-up which consist [sic] of wiping rails down or washing out tanks with a water hose was not offered or even considered . . . , alchemy (computer learning) which is due every month was not offered or considered . . . ." (ECF No. 92, at 3.)  Coleman does not set out the basis for this knowledge or whether he is competent to testify about these facts, as required by Rule 56(c)(4).  Furthermore, Coleman does not indicate whether Kellogg needed such work at the time, whether other employees were already performing this work, or whether Coleman was qualified to do this work.  As such, he has failed to create a genuine dispute of material fact.

[12] Coleman adds that "the return to work was mandatory under the meaningful return to work rule" (ECF No. 92, at 4), but the materiality of that fact is unclear, and it does not bring Kellogg's Fact No. 28 into dispute.

6

however, until she was informed by Kellogg's attorney while preparing her May 2025 declaration. (*Id.* ¶ 31.)

On November 30, 2023, Coleman settled his worker's compensation claim and told Kellogg the next day that he could return to work without restrictions. (*Id.* ¶ 32.) In January 2024, Coleman's doctor released him to return to work in his pellet-maker position, but he placed himself on indefinite leave because he feared he would reinjure himself. (*Id.* ¶ 33.) Coleman then filed another worker's compensation claim. (*Id.*)

Coleman made three ethics-line complaints to Kellogg. (*Id.* ¶ 34.) Coleman's July 2022 ethics complaint alleged that manager Frenchie Smith spoke harshly to him, told him not to wear jewelry anywhere inside the plaint, and told him there were no light-duty assignments for him. (*Id.*) Kellogg investigated the complaint but found it unsubstantiated because it was unclear to Smith that Coleman had been medically released to return to work or had any authority to be in the plant and because Kellogg had no alternative light-duty work available within Coleman's specific restrictions. (*Id.*) Coleman's second ethics complaint in September 2022 alleged that his medical restrictions were not being honored because he was not placed in an alternative job. (*Id.* ¶ 35.) The investigation concluded after Kellogg evaluated his restrictions and determined it could not accommodate them. (*Id.*) Kellogg afforded Coleman a paid leave of absence as an accommodation and determined that it did not fail to accommodate his work restrictions. (*Id.*) Coleman's third ethics complaint on January 20, 2023, alleged that he had been retaliated against for having reported unsafe work conditions and for crossing the picket line. (*Id.* ¶ 36.) Coleman claimed that Kellogg retaliated by denying him a copy of the Supplemental Collective Bargaining Agreement ("CBA"). (*Id.*) Kellogg investigated and learned that the Memphis human resources department did not have copies of the newly negotiated Supplemental CBA.

7

(*Id.*)  Coleman received a copy of the Master CBA and Supplemental CBA.  (*Id.*)  Kellogg concluded its investigation and found that no one retaliated against Coleman because of his complaints or crossing the picket line.  (*Id.*)

On June 6, 2023, Coleman filed EEOC Charge 490-2023-01105 ("EEOC Charge #1"), alleging that Kellogg discriminated and retaliated against him by denying him light-duty work and deactivating his employee badge for complaining about safety issues, in violation of Title VII and the ADA.  (*Id.* ¶ 37.)  On October 5, 2023, Coleman filed EEOC Charge 490-2023-03258 ("EEOC Charge #2") after he filed the instant lawsuit.  (*Id.* ¶ 38.)  In EEOC Charge #2, Coleman alleged that Kellogg retaliated against him for filing EEOC Charge #1 by not timely paying for his missed time-clock punches.  (*Id.*)  Kellogg terminated Coleman on June 7, 2024, for violating work rules, and his termination grievance is currently proceeding through the Union.  (*Id.* ¶ 41.)

## PROPOSED CONCLUSIONS OF LAW

Based on a generous reading of Coleman's Complaint, he alleges that Kellogg (1) discriminated against him in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112–12117 ("ADA"), by failing to accommodate his request for light-duty work, (2) retaliated against him in violation of the ADA, and (3) retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 ("Title VII").  (ECF No. 1, at 1, 4.)[13]

---

[13] Though Coleman makes reference to his termination throughout his Response, he has not pled a claim for wrongful termination.  (*See* ECF No. 1.)  As noted by Kellogg, Coleman has never sought leave to amend his Complaint to add a wrongful termination claim and apparently intends to litigate that claim separately from this lawsuit.  (*See* ECF No. 88, at 6.)  Any allegations, purported facts, or arguments he offers about his termination are therefore disregarded, as they are irrelevant and immaterial to the claims at issue in this case.

I.  **Legal Standard for Summary Judgment**

Courts evaluate motions for summary judgment under Federal Rule of Civil Procedure 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Harper v. City of Cleveland*, 781 F. App'x 389, 392 (6th Cir. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). Thus, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017) ("Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.") (quoting *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 526 (6th Cir. 2014)). "A material fact is one 'that might affect the outcome of the suit,' and a genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The moving party bears the burden of showing that no genuine issues of material fact exist." *McClellan v. Midwest Machining, Inc.*, 900 F.3d 297, 302 (6th Cir. 2018) (citing *Celotex*, 477 U.S. at 324). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

9

In evaluating summary judgment motions, a court must "draw all reasonable inferences in favor of the nonmoving party." *Harper*, 781 F. App'x at 392 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Nevertheless, "[t]he nonmoving party must do more than simply 'show that there is some metaphysical doubt as to the material facts.'" *Stevens-Bratton v. TruGreen, Inc.*, 437 F. Supp. 3d 648, 652 (W.D. Tenn. 2020) (quoting *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018)). A properly supported motion for summary judgment will not be defeated by conclusory allegations, speculation, or unsubstantiated assertions. *Bradley*, 587 F. App'x at 866 (citing *Lujan*, 497 U.S. at 888). In determining whether a dispute of material fact exists, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). At the same time, "[a] district court is not required to search the entire record to establish that it is bereft of a genuine issue of material fact," as "judges are not like pigs, hunting for truffles that might be buried in the record." *Emerson*, 446 F. App'x at 736 (citations, quotations, and alterations omitted).

"Although summary judgment must be used carefully, it 'is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action[,] rather than a disfavored procedural shortcut.'" *Stevens-Bratton*, 437 F. Supp. 3d at 652 (quoting *FDIC v. Jeff Miller Stables*, 573 F.3d 289, 294 (6th Cir. 2009)). Ultimately, "[w]hen the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." *Peterson v. Medtronic, Inc.*, No. 2:17-cv-02457-MSN-atc, 2020 WL 6999225, at *4 (W.D. Tenn. Sept. 30, 2020) (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 914 (6th Cir. 2013)). "These standards

apply regardless of a party's *pro se* status; the liberal pleading standard for *pro se* parties is inapplicable once a case has progressed to the summary judgment stage." *Almasri v. Valero Ref. Co. – Tenn., LLC*, No. 2:20-cv-02863-SHL-tmp, 2022 WL 895732, at *3 (W.D. Tenn. Feb. 18, 2022), *report and recommendation adopted*, 2022 WL 891842 (W.D. Tenn. Mar. 25, 2022) (citations and internal quotations omitted).

## II.   ADA Discrimination

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Disability discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  § 12112(5)(A).  To establish a *prima facie* case for failure to accommodate, the plaintiff must show that "(1) he is disabled under the ADA; (2) he is otherwise qualified for the position, with or without a reasonable accommodation; (3) his employer knew or had reason to know of his disability; (4) he requested a reasonable accommodation; and (5) the employer failed to provide the reasonable accommodation." *Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 350 (6th Cir. 2015) (citing *Johnson v. Cleaveland City Sch. Dist.*, 443 Fed. App'x 974, 982–83 (6th Cir. 2011)).

A reasonable accommodation may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for

11

individuals with disabilities." § 12111(9)(B). "[T]he employee typically bears 'the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 371–72 (6th Cir. 2024) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)).

Kellogg argues that it gave Coleman the only reasonable accommodation it was required to give by providing him with the time off recommended by his doctor. (ECF No. 84-1, at 7.) Though Coleman argues that he should have been provided light-duty work instead, Kellogg contends that no such work was available and that it was not required to create additional work for Coleman. (ECF No. 84-1, at 7.)[14]

It is undisputed that Kellogg provided Coleman with the reasonable accommodation of time off per his doctor's recommendation. It is also undisputed that no light-duty assignments were available for Coleman, either because all light-duty work was already assigned to other employees or because Kellogg had no need for the light-duty work. An employer's "'duty to locate suitable positions for' employees with disabilities . . . does not require employers 'to create new jobs [or] displace existing employees from their positions . . . to accommodate a disabled individual.'" *Cooper*, 93 F.4th at 372 (quoting *Kleiber*, 485 F.3d at 869, 870); *see also Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004) (citing *Burns v. Coca-Cola*

---

[14] Coleman also takes issue with the process Kellogg used to determine that it could not offer Coleman the accommodation of light-duty work (ECF No. 92, at 3, 5), but he does not dispute that Kellogg did indeed make that determination. At this stage, the onus is on Coleman to demonstrate that the accommodation he requested was reasonable and was not provided by Kellogg. His process-related arguments in the absence of that demonstration are thus unavailing. *See Kleiber*, 485 F.3d at 868–69 ("[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination. This conclusion is consistent with the definition of direct evidence, for if the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination." (citations omitted)).

12

*Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000)) (holding that "a 'reasonable accommodation' may include reassignment to a vacant position" but does not include displacement of existing employees); *Burns*, 222 F.3d at 257 ("Employers are not required to create new jobs, displace existing employees from their positions, or violate other employees' rights under a collective bargaining agreement or other non-discriminatory policy in order to accommodate a disabled individual.").[15] Coleman's requested accommodation of assignment to an unavailable position was thus objectively unreasonable. *See Cooper*, 93 F.4th at 373 ("Because the position was not vacant, it was not a reasonable accommodation as a matter of law.").

Because Kellogg simply had no open light-duty assignments, Coleman's arguments about his qualifications for those assignments, his relative seniority, or the state of the production floor are inapposite. Coleman has not created a genuine dispute of material fact that the accommodation he requested was reasonable, and his *prima facie* case of discrimination must fail.

Coleman's *prima facie* case also fails because Kellogg did provide a reasonable accommodation to him. "[A]n employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided." *Hedrick*, 355 F.3d at 457 (quoting *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–01 (6th Cir. 1996)). "[T]he law in this circuit does not entitle [the plaintiff] to the accommodation of her choice, but only a reasonable accommodation." *Black v. Wayne Ctr.*, 225 F.3d 658, 2000 WL 1033026, at *4 (6th Cir. July 17,

---

[15] Coleman points to the testimony of Patrece Edwards that Claudia Langarica, Kellogg's Environmental, Health & Safety Manager at the plant, told her "that, going forward, everyone that got hurt at the job would have light duty. They would make accommodations for them." (ECF No. 92, at 9 (citing 84-7, at 14 (46:13–17)).) In light of this case law, however, Kellogg had no legal obligation to create new light-duty positions or assignments as an accommodation for such injured employees.

13

2000) (unpublished table opinion) (citing *Hankins*, 84 F.3d at 800). "The employer . . . has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation which is easier to provide." *Id.* Here, Kellogg provided Coleman with the accommodation of paid medical leave, albeit at two-third pay, and Coleman has offered nothing to show that accommodation was unreasonable. *See Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 782 (6th Cir. 1998) ("[A] medical leave of absence can constitute a reasonable accommodation under appropriate circumstances."). Coleman has failed show that Kellogg did not accommodate his disability, and it is therefore recommended that Kellogg be granted summary judgment on the ADA discrimination claim.

### III.    ADA Retaliation

To establish an ADA retaliation claim, the plaintiff must show that "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir.2013)).

Kellogg argues that "there is no specific ADA retaliation claim pled in Coleman's Complaint." (ECF No. 84-1, at 11.) The Complaint identifies multiple instances of retaliation—Coleman alleges that Kellogg retaliated against him (1) for making safety-related complaints by refusing him light-duty work, (2) for repeatedly asking for a copy of the CBA by attempting to confiscate his badge, (3) for an unstated reason by not paying him on time, and (4) for "citing the correct rule for wearing jewelry on the floor" by threatening termination. (ECF No. 1, at 4–5.) Coleman also alleges that (5) "Frenchie, []one of the managers I had an earlier retaliation complaint against, was part of the HR/management team that refused me light-duty

assignments." (*Id.* at 6.)[16]  Though Coleman may not specifically label these allegations as

seeking relief under the ADA, a fair reading of this *pro se* filing is that they may be categorized

as such.  Kellogg also identifies another potential retaliation claim as stated in Coleman's EEOC

Charge #2: that (6) Kellogg retaliated against him for filing EEOC Charge #1 by not paying him

for work performed from June to August 2023 until September 2023.  (ECF No. 84-1, at 11; ECF

No. 84-5, at 111.)[17]  To survive summary judgment, Coleman must demonstrate a genuine

dispute of material fact as to each element of the *prima facie* case for each of these six claims.

     A.     Protected Activity

"Under the ADA, '[p]rotected activity' includes 'opposition' to unlawful employment

discrimination and 'participation' in investigations or proceedings involving unlawful

discrimination."  *Moody v. MidMichigan Med. Ctr. Midland*, 704 F. Supp. 3d 772, 780 (E.D.

Mich. 2023) (quoting *Skrine v. Barrett Paving Materials*, No. 13-cv-14900, 2015 WL 5214636,

at *13 (E.D. Mich. Sep. 4, 2015)).  The opposition clause "protects . . . complaints to

management and less formal protests of discriminatory employment practices."  *Laster v. City of*

*Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citing *Trujillo v. Henniges Auto. Sealing Sys. N.*

---

[16] Coleman also identifies other instances of retaliatory conduct—the deactivation of his badge, the preparation of his suspension letter before his hearing, and the failure to give him a "brochure of temporary transitional work assignments"—but he does not link these instances to any ADA protected activity or otherwise state what Kellogg was allegedly retaliating against.  (*See* ECF No. 92, at 4–7, 10, 12.)

[17] Kellogg notes that Coleman filed EEOC Charge #2 after he filed his Complaint in this case. (ECF No. 84-1, at 11.)  That fact does not, however, preclude consideration of this retaliation claim under exhaustion principles.  "[T]he general rule in this circuit [is] that the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination," and the "expected scope of investigation test" provides that a plaintiff is not precluded from pursuing in his lawsuit an uncharged claim that is nonetheless based on facts related to a charged claim.  *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 380 (6th Cir. 2002)).  The investigation of EEOC Charge #1 would be reasonably expected to encompass the conduct described in EEOC Charge #2, and thus that conduct may be considered in this case.

15

*Am., Inc.*, 495 Fed. App'x 651, 655 (6th Cir. 2012)).  However, not all activity is protected by the ADA.  *See Rorrer*, 743 F.3d at 1046 ("The ADA is not, however, a catchall statute creating a cause of action for any workplace retaliation, but protects individuals only from retaliation for engaging in, or aiding another who engages in, activity covered by the ADA." (citing 42 U.S.C. § 12203(a))).  "The ADA is a discrimination statute and does not protect an employee who . . . contest[s] employment decisions that do not involve any claims of discrimination."  *Id.*

      Coleman's first four allegations of retaliation are based on him making safety-related complaints, asking for a copy of the CBA, and citing the rule for wearing jewelry.  None of those actions involve Coleman protesting that he is being discriminated against because of a disability or taking any other action protected by the ADA.  The first four allegations of retaliation are thus not cognizable under the ADA.

      As to Coleman's fifth allegation, he states that he had made "an earlier retaliation complaint" against his manager, but he fails to specify whether that earlier complaint was made under the ADA.  Elsewhere, Coleman states:

> Frenchie Smith threaten[ed] to fire plaintiff for challenging his misquoting of the rules concerning wearing jewelry and telling him (Frenchie Smith) that Tasha's (Latasha Corbin) word held more weight than his in determining his light duty assignment, and soon after (same day) Frenchie Smith came into the HR office to tell Latasha Corbin that plaintiff could not work light duty because he did not want plaintiff to wear out his good arm (not because they could not accommodate plaintiff's work restrictions).

(ECF No. 92, at 4.)  Though here Coleman references the light-duty-assignment issue, it appears his position is that Smith was upset that Coleman challenged Smith's authority relative to Corbin's, not that Smith was retaliating against Coleman because of his injuries or requests for accommodation.  As such, this allegation is another example of general retaliation in the employment context, not retaliation in the face of ADA protected activity.

16

Having failed to identify any ADA protected activity for his first five allegations of retaliation, Coleman has failed to make his *prima facie* case as to those allegations. Kellogg does not contest that Coleman's sixth retaliation claim involves protected activity (ECF No. 84-1, at 11), and so the Court will continue the *prima facie* analysis as to that claim.

B.   Knowledge

Kellogg argues that the retaliation claim stated in Coleman's EEOC Charge #2 fails to satisfy the second element of the *prima facia* case. (ECF No. 84-1, at 12.) EEOC Charge #2 states:

> On June 6, 2023, I filed an EEOC charge of discrimination against my employer . . . . On June 21, 2023, I returned back to work from medical leave with no restrictions. I was told to use missed punch forms to track my hours worked, but I was not being paid. On August 22, 2023, I went back on medical leave due to a recurring injury. I was not paid my hours work until September 2023.
>
> I believe I was retaliated against for filing a previous EEOC charge in violation of the [ADA].

(ECF No. 84-5, at 111.) In his deposition, Coleman testified that he believed Labor Relations Advisor Bryson was responsible for this retaliation:

> Q:   Okay. And what makes you believe—I think you said Brenda did that to you in retaliation?
>
> A:   Because–
>
> Q:   Am I right you think Brenda retaliated?
>
> A:   Yes.
>
> Q:   And why do you think that?
>
> A:   She was just upset about the whole situation, and she just had me down as a troublemaker, you know, so I know I submitted a couple of missed punches to her directly you know, so. . . . I put them in her hand. Those were the one that I didn't get paid for, you know.

17

(ECF No. 84-5, at 72–73 (114:18–115:11); *see also id.* at 44–45 (79:24–80:14) (Q: . . . You believe all of that is retaliation for having filed the previous charge, correct? A: Yes. Correct. I gave my missed punches to Brenda Bryson and so she was the subject of all this.").)

It is undisputed, however, that Bryson was unaware of Coleman's EEOC Charge #1 until May 6, 2025. Thus, whether or not Bryson deliberately failed to process Coleman's pay, that act could not have been taken with retaliatory purpose because she did not know about his ADA protected activity. A plaintiff who fails to create a genuine issue of material fact that the alleged retaliatory decisionmaker knew about his protected activity cannot satisfy the *prima facie* case of retaliation. *See, e.g.*, *Dulaney v. Flex Films (USA), Inc.*, No. 20-6098, 2021 WL 3719358, at *7 (6th Cir. Aug. 23, 2021) (collecting cases).

Coleman has failed to make out a *prima facie* case of ADA retaliation, and it is therefore recommended that Kellogg be granted summary judgment on this claim.

**IV.    Title VII Retaliation**

Title VII prohibits an employer from discriminating against an employee because of their race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Under Title VII, it is unlawful for an employer to retaliate against an employee "because he opposed any practice made an unlawful employment practice under this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." § 2000e-3(a). To establish a *prima face* case of retaliation under Title VII, Coleman must demonstrate that (1) he engaged in protected activity, (2) Kellogg knew of such protected activity, (3) Kellogg then "took an action that was 'materially adverse'" to Coleman, and (4) "a causal connection existed between the protected activity and the materially adverse action." *Laster*, 746 F.3d at 730 (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)).

18

Coleman has failed to allege that he is a member of a Title VII protected class or that he participated in any Title VII protected activity. As discussed above, he alleges he was retaliated against because of his EEOC Charge #1 or his safety-related complaints and other general conduct at work. None of that activity is protected activity under Title VII, as none of it has anything to do with opposing discrimination based on race, color, religion, sex, or national origin. And, as noted by Kellogg, the case Coleman cites, *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558 (6th Cir. 2016), is inapplicable because the plaintiff in that case alleged discrimination based on sex. Coleman has failed to state a claim for Title VII retaliation.

## **RECOMMENDATION**

For the reasons set forth above, it is recommended that Kellogg's Motion for Summary Judgment be granted and Coleman's case be dismissed in its entirety.

Respectfully submitted this 31st day of July, 2025.

> s/Annie T. Christoff
> ANNIE T. CHRISTOFF
> UNITED STATES MAGISTRATE JUDGE

## **NOTICE**

Within fourteen (14) days after being served with a copy of this report and recommendation disposition, a party may serve and file written objections to the proposed findings and recommendations. A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Failure to file objections within fourteen (14) days may constitute forfeiture/waiver of objections, exceptions, and further appeal.